**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**FINITE STATE, INC.**
800 North High Street
Suite 03-108
Columbus, Ohio 43215

Plaintiff,

v.

**BETH LINKER**
10 Sunset Road
Arlington, MA 02474

Defendant.

Case No. ______________

Judge ________________

Magistrate Judge __________

---

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Finite State, Inc. (“Finite State” or the “Company”), by and through counsel, brings this action against Defendant Beth Linker (“Linker”)[1] and alleges as follows:

## INTRODUCTION

1. Defendant Beth Linker served in one of Finite State’s most valuable and important roles: its Chief Product Officer. In that role, Linker oversaw the product roadmap, the technical work behind the Company’s competitive advantage, its pricing, its customers and their contract terms, and its plans for what to build next.

2. When Linker’s employment with Finite State ended, Finite State did not simply write Linker a severance check. It bought an essential element of protection in return.

3. Represented by counsel, and in exchange for $63,462.00 and three months of subsidized COBRA coverage, Linker promised not to work for a direct competitor for twelve months, and

[1]Linker uses they/them pronouns. This Complaint refers to Linker by name wherever possible; where a pronoun is used, it is “they.”

separately reaffirmed the confidentiality and employee non-solicitation obligations of the Confidentiality Agreement they had signed on April 8, 2025.

4. Finite State paid Linker. Roughly ten weeks later, and in direct breach of the Separation Agreement, Linker went to work for ArgusEye, Inc., ("ArgusEye"), a direct competitor of Finite State, as its Head of Product.

5. ArgusEye sells essentially the same product, built on the same pipeline, to the same customers, to satisfy the same regulations. The overlap between the two companies is closest on a particular product that was in private preview, and that remains unreleased to the full public, while Linker was Chief Product Officer.

6. Finite State wrote to Linker on August 12, 2026, identified Linker's breach, and demanded that Linker stop work for ArgusEye. It then offered to hold litigation in abeyance if Linker would agree to a brief standstill while the parties negotiated. On August 20, 2026, Linker's counsel refused, replying that a standstill "is not an option."

7. Linker works for ArgusEye today, in open breach of an agreement Linker negotiated, signed, and was paid for.

8. Finite State asks this Court for narrow relief.[2] It does not ask the Court to bar Linker from earning a living, from working in technology, or from working in product management. It simply asks the Court to hold Linker to the promise Linker made to Finite State.

[2] Section 19 of the Separation Agreement and Section 12 of the Confidentiality Agreement contain arbitration provisions, both of which expressly preserve the parties' right to obtain provisional injunctive relief from a court. Finite State seeks such relief here consistent with those provisions and reserves all rights with respect to arbitration of the merits.

## PARTIES, JURISDICTION AND VENUE

9. Finite State is a Delaware corporation with its principal place of business at 800 North High Street, Suite 03-108 Columbus, Ohio 43215. It was founded in 2017 by Matt Wyckhouse, its Chief Executive Officer, and David Harvilicz.

10. Linker is an individual who resides at 10 Sunset Road, Arlington, MA 02474, and is a citizen of Massachusetts.

11. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Finite State asserts a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367(a), because those claims arise from the same case or controversy: Linker's employment by Finite State, the agreements Linker signed, and Linker's employment by ArgusEye. In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is diversity of citizenship between the Parties.

12. This Court has personal jurisdiction over Linker. In Section 28 of the Separation Agreement, Linker expressly "consent[ed] to personal and exclusive jurisdiction and venue in the State of Ohio." This Court also has personal jurisdiction over Linker under Ohio's long-arm statute on multiple grounds, including but not limited to, the fact that Linker transacted business in Ohio by entering into and performing an employment relationship with an Ohio company.

13. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District and because Linker consented to venue in Ohio.

14. The Separation Agreement is also governed by Ohio law.

## FACTUAL ALLEGATIONS

***Finite State and its trade secret and confidential information.***

15. Finite State provides product security software and services to manufacturers of connected devices. Connected devices are increasingly woven into the fabric of modern life. Connected devices include medical devices like infusion pumps, ventilators, continuous glucose monitors, imaging systems, and surgical robots. One can also find connected devices in cars (*e.g.*, keyless entry); industrial products (*e.g.*, smart sensors and transmitters), energy and critical infrastructure (*e.g.*, battery storage controllers); consumer products (*e.g.*, smart locks, thermostats, connected appliances), government and defense (*e.g.*, tactical radios, satellite ground terminals), and networking and telecom (*e.g.*, firewall and VPN appliances).

16. The product that Finite State offers is highly technical and specialized. Finite State makes software that tells a manufacturer whether the product it is about to release is secure. It works from two inputs: (1) the manufacturer's design documents, and (2) the actual code that will be loaded onto the finished product. From those, the Finite State platform identifies what the product is built from, how its parts communicate with one another, and where the vulnerabilities lie. It then maps the ways the product could be attacked, ranks which of those weaknesses matter and which do not, writes specific engineering instructions for closing the ones that do, and assembles the proof the manufacturer must hand to regulators.

17. What sets Finite State apart from its competitors is that to achieve the highest level of validity, it checks its conclusions against customers' finished products, rather than against what the customer says its product contains. Software is written in a form people can read and then converted into a form only the device itself can run. Finite State examines that converted form (the code that actually ships) and can do so for more than fifty different families of processors,

which is what allows it to work across products as diverse as an infusion pump and a car. From that code, Finite State builds the product's own parts list, known in the industry as a software bill of materials (most tools instead accept the parts list the manufacturer's developers wrote down, which is frequently incomplete or out of date). Finite State then compares the two: what the design says the product is, against what the product actually is.

18. To offer an analogy, the distinction between competitors and Finite State is similar to the difference between reading a recipe and analyzing the finished dish. The recipe tells you what the cook intended to use, but only analyzing the dish tells you what is actually in it.

19. Finite State sells to the product security function at connected-device manufacturers in the medical device, automotive, industrial and operational technology, energy, government and critical infrastructure, consumer connected device, and defense sectors, all around the world. Its customers buy in substantial part to satisfy the EU Cyber Resilience Act, FDA guidance under 21 U.S.C. § 360n-2 (section 524B), ISA/IEC 62443, and related regulatory regimes.

20. On February 17, 2026, Finite State launched Assurance Studio to private preview. It has not been generally released. Assurance Studio uses AI to read a manufacturer's own design documents, and turns them into a structured map of how the product could be attacked, a list of the security requirements the product must therefore meet, and a record tying each of those requirements to the government regulations the manufacturer has to satisfy. The design decisions behind Assurance Studio, the sequence and logic of its pipeline, the capabilities Finite State chose to build and in what order, its intended positioning and pricing, and the identity of and feedback from its private-preview customers are among the Company's most valuable trade secrets.

21. Linker was Chief Product Officer throughout the development of Assurance Studio and through its private preview launch on February 17, 2026.

22. Finite State's competitive position also depends on its source code, its analysis methodologies, its roadmap beyond Assurance Studio, its pricing and margin structure, its customer lists and contract terms, its vendor relationships, its go-to-market strategy, and its personnel information. That information derives independent economic value from not being generally known or readily ascertainable by proper means, and it relates to products and services used in interstate commerce.

23. That information is not known outside Finite State, and within the Company it is known only to those who need it. Finite State has developed its capabilities continuously since its founding in 2017, at a cost of $50,528,400 , and it began working on the Assurance Studio in August 2025. A competitor could not acquire or duplicate that work without a comparable investment of time and money, and Finite State's advantage over its competitors depends on that work remaining unavailable to them.

24. Finite State takes reasonable measures to keep this information secret. It requires employees to sign a Proprietary Information and Inventions Assignment Agreement as a condition of employment, maintains an Employee Handbook and Code of Conduct imposing confidentiality and information-security obligations, restricts access to its systems and information, and requires departing employees to return all Company property.

25. Finite State maintains its information-security and compliance program through Vanta (a continuous monitor of technical controls) and enforces written policies including an Access Control Policy, an Asset Management Policy, a Human Resource Security Policy, an Information Security Policy and Acceptable Use Policy, and a Secure Development Policy.

Employees must safeguard Company devices and credentials, use credentials managed through 1Password, and enable multi-factor authentication. Access to Company systems and information is provisioned on a need-to-know basis.

26. Under Finite State's Access Control Policy, access to Company systems is limited to personnel with a business requirement for it and is assigned by role under the "principle of least privilege," such that "[p]ermissions and access rights not expressly granted shall be, by default, prohibited." Access to program source code and associated designs, specifications, and verification and validation plans is "strictly controlled" and granted only on business need, and all access rights are removed upon termination of employment within a maximum of twenty-four business hours.

27. Finite State's Device Security and Usage Policy requires that every Company-owned device be selected from an approved list, enrolled in the Company's Mobile Device Management system at all times, and configured with full disk encryption "before any Finite State data is accessed from the device," along with active antimalware and firewall software and complex account passwords. That policy further provides that proprietary persisted data — expressly including "the source code to our applications and services" — "may only be downloaded … on devices that are owned and managed by Finite State," that employees "are prohibited from downloading such information to their personal devices," and that personnel "are not to have any persistent proprietary data on their personal devices."

28. The Company's Data Management Policy independently classifies source code, strategic plans, and customer data as "Confidential" — its most protected tier — and requires that such data be encrypted on Company laptops, be kept off personal phones and devices, and be saraccessible only to specific approved employees, roles, or departments. On separation, all

access to Company applications ceases upon termination, the departing employee must delete Company applications from any personal device and coordinate the return of all Company equipment, Company devices are "collected promptly upon an employee's termination" with remote employees "sent a shipping label and the return of their device … monitored," and returned devices are securely erased before reprovisioning, with device images retained "at the discretion of management for business or legal purposes."

29. Throughout Linker's employment, access to Assurance Studio was controlled by and limited to only the executive team, of which Linker was a part, until late January 2026 when subject matter experts were brought in to assist in getting the product ready for launch. The pricing model, packaging and strategy were confined to the executive team, including Linker, during her employment.

30. On separation, Finite State revokes system access on or before the employee's termination date and requires the return of all Company property through a defined offboarding process. Linker's Company laptop was to be returned through Sentant, which sent Linker a shipping label and box. Linker's laptop was returned on or about June 9, 2026.

***Linker's employment and access.***

31. By letter dated April 4, 2025, Finite State offered Linker the position of Chief Product Officer at a base salary of $275,000, on-target earnings of $330,000, and an option to purchase 648,681 shares of common stock. Linker accepted that day. The Offer Letter conditioned employment on Linker "signing and agreeing to be bound by the Company's Proprietary Information and Inventions Assignment Agreement." A true and accurate copy of the Offer Letter is attached as **Exhibit 1**.

32. On April 8, 2025, Linker signed that agreement (the "Confidentiality Agreement"). A true and accurate copy is attached as **Exhibit 2**. Linker was publicly appointed Chief Product Officer on April 24, 2025.

33. Linker came to Finite State having led static application security testing and artificial intelligence product strategy at Black Duck (formerly the Synopsys Software Integrity Group), and having held senior product roles at Dell, SecureWorks, and Acquia.

34. As Chief Product Officer, Linker sat at the center of the product organization and had access to the full range of the confidential information and trade secrets described above. Linker was also entrusted with the Company's goodwill in dealing with its customers and prospective customers.

***Linker's contractual obligations.***

35. Section 2.A of the Confidentiality Agreement obligates Linker, "at all times during the term of my employment *and thereafter*," to hold Company Confidential Information in strictest confidence and not to use or disclose it without written authorization from an officer of the Company. The agreement defines that term broadly to include non-public information relating to the Company's actual or anticipated business or research and development; technical data, trade secrets, and know-how; product plans; customer lists, contact information, buying history, contract negotiations, and preferences; vendor information; personnel information; software, inventions, processes, and designs; and marketing, pricing, financing, and business information.

36. Section 12.C(8) of the Confidentiality Agreement provides that "any breach or threatened breach of such an agreement will cause irreparable injury and that money damages will not provide an adequate remedy therefor," and that both parties "consent to the issuance of a

provisional and/or permanent injunction." In Section 11 of the Separation Agreement, Linker reaffirmed that provision.

37. Linker's employment ended effective May 22, 2026 (the "Separation Date") as a result of concerns about Linker's performance. Finite State sent a proposed Separation Agreement on May 21, 2026. On May 22, Linker responded that "[a]fter having a lawyer review it," Linker asked for a change to the language of Section 1(c) and wanted Finite State to countersign first. Finite State agreed to both requests, and the executed Agreement contains the Section 1(c) language Linker asked for.

38. Linker signed the Separation Agreement and Release (the "Separation Agreement") on May 27, 2026, and Finite State, through Chief Operations Officer Tim Quock, signed on May 28, 2026. A true and accurate copy is attached as **Exhibit 3**. Under Section 29 it became effective on the eighth day after Linker signed, and Linker did not revoke it. Linker was advised in writing to consult an attorney, was given twenty-one days to consider the Agreement and seven days to revoke it, and in fact consulted counsel and negotiated changes.

39. In consideration for Linker's promises, Finite State agreed to pay a lump sum of $63,462.00, less withholding, equivalent to approximately twelve weeks of base salary, and to reimburse a portion of Linker's COBRA premiums for three months. Separation Agreement § 1. Finite State performed. It paid Linker the full $63,462.00 on or about June 10, 2026, and Linker accepted and retained that money.

40. Linker understood exactly what was being purchased. Linker had the Agreement reviewed by counsel, asked Finite State to modify Section 1(c), asked Finite State to countersign first, obtained both, and then signed. Linker did not ask Finite State to remove or narrow Section 12.

41. Section 12(a) of the Separation Agreement provides:

> For a period of twelve (12) months following the Separation Date, Employee agrees not to, directly or indirectly, whether as an employee, consultant, advisor, independent contractor, owner, partner, or in any other capacity, work for or provide services to any company that directly competes with the Company in the cybersecurity, IoT security, or device security software and services markets, specifically including but not limited to companies that provide firmware analysis, vulnerability assessment, or supply chain security solutions for connected devices.

42. Section 12(b) provides that Linker "acknowledges that violation of this Section would cause irreparable harm to the Company, and therefore the Company shall be entitled to seek injunctive relief in addition to any other available remedies," and that the restrictions are severable and, "if found to be unenforceable as written, shall be modified to the minimum extent necessary to make them enforceable while preserving the maximum protection for the Company's legitimate business interests."

43. Section 11 provides that Linker "reaffirms and agrees to observe and abide by the terms of the Confidentiality Agreement, specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information, and nonsolicitation of Company employees," and that this reaffirmation "shall constitute a new and separately enforceable agreement," effective as of the Effective Date. Any violation of those covenants "shall constitute a material breach of" the Separation Agreement. Section 11 also constitutes Linker's certification under penalty of perjury that all Company documents, items, and passwords were returned.

44. Section 16 entitles Finite State, upon a material breach, immediately to recover and to cease providing the consideration paid under the Agreement, less One Hundred Dollars ($100.00), and to obtain damages. Section 25 entitles the prevailing party in an enforcement action to its costs and reasonable attorneys' fees.

***ArgusEye directly competes with Finite State.***

45. ArgusEye's product is an automated threat-modeling platform called Sentry, which it markets as an automated product security architect and "a virtual senior PSE on every product line" — an AI product security digital workforce embedded inside a manufacturer's engineering organization.

46. ArgusEye's own public materials describe the clear competitive overlap between the two companies.

47. First, ArgusEye markets the same pipeline. Finite State's Assurance Studio ingests architecture artifacts, derives components, interfaces, and trust boundaries, auto-generates threat models, scores risk, generates testable security requirements, and maps them to regulatory controls. ArgusEye describes the same six-step sequence under different labels, and its four stated product pillars map one-to-one onto Finite State capabilities:

a. requirement verification corresponds to Security Requirements Generation;

b. continuous threat modeling corresponds to the Assurance Studio Threat Model Canvas;

c. controls and automated VEX[3] correspond to Exploitability-Based Prioritization; and

d. regulatory compilation corresponds to Automated Evidence-Backed Compliance.

---

[3] "VEX" stands for Vulnerability Exploitability eXchange. When software is analyzed for security flaws, the analysis returns a long list of publicly reported vulnerabilities found in the product's components — often thousands. Most do not actually put the product at risk, because the flawed code may not ship or may never run. A VEX document is the manufacturer's machine-readable statement, vulnerability by vulnerability, of which ones actually affect the product and which do not, and why. "CSAF," referenced below, is the published format both companies use for these statements.

48. The two products take the same inputs — architecture documents and specifications, from which components, interfaces, and trust boundaries are derived — and produce the same outputs: auto-generated threat models, testable security requirements, reachability-aware findings, VEX, and continuously maintained audit-ready evidence.

49. Both companies also sell against the same regulatory drivers: the EU Cyber Resilience Act, including its September 2026 Article 14 reporting deadline and December 2027 Annex II documentation deadline; FDA section 524B and the eSTAR submission process; ISA/IEC 62443; CMMC and SPD-5; and the CSAF profile for VEX.

50. Both companies sell to the same buyer — product security engineering and PSIRT (product security incident response) teams at connected-device manufacturers — and ArgusEye markets Sentry expressly against the cost and delay of hiring a senior product security engineer.

51. The vertical markets are the same for both companies: medical devices, operational technology and industrial, consumer connected devices, and defense and government. Both treat medical devices as a flagship vertical markes, and both address connected-vehicle security.

52. Both companies also adopted the same "autonomous" and "agentic" framing and the same reachability-plus-CSAF-VEX messaging within the same 2025 to 2026 window. Third parties also place both companies in the same connected-device product security category.

53. While the two products may not be identical in every respect, a competitor selling the same pipeline to the same buyers against the same regulations, and lacking the binary grounding Finite State built, has an obvious and immediate use for what Finite State's Chief Product Officer knows.

***Linker holds the same job at ArgusEye that they held at Finite State.***

54. At Finite State, Linker set the product roadmap, decided what the Company would build and in what order, defined the capabilities of Assurance Studio, supplied the inputs to positioning and pricing, and worked directly with customers and private-preview participants. Linker was part of a broader team composed of cross-functional experts chosen to address fixes and issues in connection with the design and development of Assurance Studio. As a member of that team, Linker had access to all of the strategic framing for the Company's products and services, including Assurance Studio. During her employment, Linker attended all strategy meetings related to the formation and development of Assurance Studio, as well as one-on-one meetings with other members of the executive team.

55. Upon information and belief, at ArgusEye, Linker is Head of Product and the function is the same, over a product that takes the same inputs, produces the same outputs, is sold to the same buyers, and is marketed against the same regulations.

56. Upon information and belief, ArgusEye employs approximately eight people. Consequently, there is no product organization within which Linker could be screened from ArgusEye's product decisions, because Linker *is* ArgusEye's product organization. Whatever assurances ArgusEye may have given about Finite State's information, no screen is possible in a company of that size for its Head of Product.

57. For these reasons, Linker cannot perform the same role that ArgusEye hired Linker to do without drawing on what Linker knows about Finite State's unreleased product, its roadmap, its pricing, and its customers. Every product decision Linker makes at ArgusEye — what to build, what to build first, what to charge, whom to sell to, and which regulatory claims to make — is a decision Linker made, or watched being made, at Finite State within the last twelve months.

***Linker joins ArgusEye and refuses to stand down.***

58. Upon information and belief, Linker began working for ArgusEye as its Head of Product on or about July 31, 2026, approximately ten weeks after the Separation Date and well within the restricted period. Finite State learned of it on or about July 28, 2026, from Linker's public LinkedIn profile.

59. ArgusEye announced the appointment publicly in July 2026.

60. Upon information and belief, ArgusEye knew of Linker's obligations to Finite State when it hired Linker and knows of them now. Finite State expressly reserves all claims against ArgusEye, including for tortious interference with contract.

61. On August 12, 2026, Finite State, through counsel, sent Linker a letter identifying Linker's obligations, advising that employment with ArgusEye breached them, and demanding that Linker immediately cease performing work for ArgusEye. A true and accurate copy, with enclosures, is attached as **Exhibit 4**. The letter further demanded that Linker, by August 14, 2026, return all Finite State property, identify without altering any Finite State files in Linker's possession, and account for any use of Finite State's information and any communications with its customers, employees, or contractors.

62. Linker's counsel responded to the letter, and counsel for the parties conferred via telephone on August 17, 2026. On August 18, Finite State's counsel asked Linker's counsel to agree to a brief standstill — meaning Linker would perform no duties for ArgusEye — to allow time to explore settlement, and requested an answer by August 19. On August 20, Linker's counsel responded that while Linker "remains open to the possibility of creating a carveout(s)" in negotiations, "a complete standstill is not an option," and that Linker was "prepared to defend against any litigation."

63. Linker continues to work for ArgusEye today, and Finite State has been left with no choice but to seek this Court's intervention.

64. Given the identity between Linker's former and current roles, the overlap between the two companies' products and customers, and the breadth of what Linker knows, there is a substantial threat that Linker will use or disclose Finite State's trade secrets in performing Linker's duties for ArgusEye. Once used or disclosed, those trade secrets cannot be recovered. The harm cannot be undone or measured in money, and Finite State has no adequate remedy at law.

## FIRST CLAIM FOR RELIEF

### Breach of Contract — Separation Agreement § 12 (Noncompetition)

65. Finite State repeats and realleges the allegations above as if fully set forth here.

66. The Separation Agreement is a valid and enforceable contract between Finite State and Linker.

67. Linker signed the Separation Agreement on May 27, 2026, and Finite State signed on May 28, 2026. The Agreement became effective on June 4, 2026, and Linker did not revoke it.

68. Linker was advised in writing to consult an attorney before signing, was given twenty-one days to consider the Agreement and seven days to revoke it, and in fact consulted counsel. Linker asked Finite State to change the language of Section 1(c) and to countersign the Agreement first, and obtained both requests before signing. Linker did not ask Finite State to remove or narrow Section 12.

69. Finite State performed all of its obligations under the Separation Agreement. It paid Linker a lump sum of $63,462.00, less applicable withholding, and reimbursed a portion of Linker's COBRA premiums for three months, as Section 1 required.

70. That consideration was in addition to anything of value to which Linker was otherwise entitled. Linker acknowledged as much in Section 7 of the Agreement.

71. Section 12(a) prohibits Linker, for a period of twelve months following the Separation Date, from directly or indirectly working for or providing services to any company that directly competes with Finite State in the cybersecurity, IoT security, or device security software and services markets, specifically including companies that provide firmware analysis, vulnerability assessment, or supply chain security solutions for connected devices.

72. The Separation Date was May 22, 2026. The restricted period runs through May 22, 2027.

73. On or about July 28, 2026 — approximately ten weeks after the Separation Date, and well within the restricted period — Linker began working for ArgusEye, Inc. as its Head of Product.

74. ArgusEye is a direct competitor of Finite State. It sells an automated threat-modeling platform that takes the same inputs, produces the same outputs, is sold to the same buyers, and is marketed against the same regulatory regimes as Finite State's platform.

75. The competitive overlap between the two companies appears on the face of ArgusEye's own public materials, including its product marketing and its public announcement of Linker's appointment.[4]

76. By working for ArgusEye as its Head of Product during the restricted period, Linker is providing services to a company that directly competes with Finite State.

---

[4] Finite State brings this action against Linker alone at this time. Finite State expressly reserves all claims against ArgusEye, Inc., including for tortious interference with contract, and intends to amend this Complaint to add ArgusEye as a defendant and to assert those claims if Linker's employment with ArgusEye continues.

77. Linker's employment with ArgusEye constitutes a breach of Section 12(a) of the Separation Agreement.

78. On August 12, 2026, Finite State, through counsel, notified Linker in writing of Linker's obligations under Section 12(a), advised that employment with ArgusEye breached them, and demanded that Linker immediately cease performing work for ArgusEye.

79. On August 18, 2026, Finite State asked Linker to agree to a brief standstill while the parties explored a negotiated resolution.

80. On August 20, 2026, Linker refused, stating through counsel that a complete standstill "is not an option" and that Linker was "prepared to defend against any litigation."

81. Upon information and belief, Linker continues to work for ArgusEye today.

82. Finite State will suffer irreparable harm as a result of Linker's breach. As Chief Product Officer, Linker acquired comprehensive knowledge of Finite State's product roadmap, its unreleased Assurance Studio product, its analysis methodologies, its pricing and margin structure, its customer lists and contract terms, and its go-to-market strategy.

83. Upon information and belief, ArgusEye employs approximately eight people, and Linker leads its product function. Linker cannot perform that role without drawing on Finite State's confidential information and trade secrets.

84. If Linker is permitted to work for ArgusEye during the restricted period, Linker will inevitably use or disclose Finite State's confidential information and trade secrets for the benefit of a direct competitor.

85. The use or disclosure of that information will cause Finite State to lose its competitive advantage, including the advantage of bringing Assurance Studio to market before a competitor can replicate it.

86. Finite State will suffer loss of customers, loss of market share, loss of fair competition, and damage to its business relationships if Linker is permitted to work for a direct competitor during the restricted period.

87. The harm to Finite State cannot be adequately remedied by monetary damages, because the value of the confidential information and trade secrets cannot be precisely quantified and the competitive harm cannot be undone once the information is disclosed.

88. Finite State has no adequate remedy at law.

89. In Section 12(b) of the Separation Agreement, Linker acknowledged that a violation of Section 12 would cause irreparable harm to Finite State and that Finite State would be entitled to injunctive relief.

90. In Section 12.C(8) of the Confidentiality Agreement, which Linker reaffirmed in Section 11 of the Separation Agreement, Linker agreed that any breach or threatened breach would cause irreparable injury, that money damages would not provide an adequate remedy, and consented to the issuance of a provisional injunction.

91. Finite State is likely to succeed on the merits of this claim.

92. The restriction in Section 12(a) is a material provision of the Separation Agreement and is reasonable and no greater than necessary to protect Finite State's legitimate business interests.

93. Section 12(a) is reasonable in duration, being limited to twelve months following the Separation Date.

94. Section 12(a) is reasonable in scope. It prohibits only work for companies that directly compete with Finite State in three identified markets. It does not prohibit Linker from working in technology, from working in product management, or from working for any company that does not directly compete with Finite State.

95. Section 12(a) is reasonable in reach. Finite State is a remote-first company that sells to connected-device manufacturers throughout the United States and internationally, and Linker served that entire customer base as Chief Product Officer. A restriction limited to Finite State's direct competitors is narrower than a territorial restriction covering the markets in which Finite State actually competes.

96. Finite State has a legitimate protectable interest in its trade secrets, its confidential information, its customer relationships, and its goodwill, to all of which Linker had access during employment, and Section 12 is a negotiated written agreement designed to protect those interests.

97. Section 12(b) does not stifle Linker's inherent skills or experience and or her ability to find other employment. Linker can obtain other employment that does not directly compete with Finite State during the restricted period. Before joining Finite State, Linker held senior product roles at Dell, SecureWorks, and Acquia and therefore can find similar product employment in other technology fields.

98. The harm to Finite State from the denial of injunctive relief outweighs any harm to Linker from enforcement of an agreement Linker negotiated with counsel, signed, and accepted payment for.

99. Enforcement of Section 12(a) is not injurious to the public. ArgusEye brought its product to market before it hired Linker and can continue to sell it without Linker.

100. The public interest favors enforcement of Section 12(a). Enforcement of valid restrictive covenants serves the public interest by protecting legitimate business interests and by holding parties to the agreements they negotiate and are paid to make.

101. Finite State is entitled to injunctive relief, to damages to be proven at trial, and to its costs and reasonable attorneys' fees under Section 25 of the Separation Agreement.

**SECOND CLAIM FOR RELIEF**

**Misappropriation of Trade Secrets — Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.**

102. Finite State repeats and realleges the allegations above as if fully set forth here.

103. Finite State owns trade secrets within the meaning of 18 U.S.C. § 1839(3), including the design, capability set, and development sequence of the unreleased Assurance Studio; the identity of and feedback from its private-preview customers; its intended positioning, launch timing, and pricing; Finite State's binary decomposition and firmware analysis methodologies, including design-to-binary reconciliation; its exploitability and reachability scoring logic; its roadmap; its pricing and margin structure; and its customer lists, contract terms, and buying history.

104. Those trade secrets relate to products and services used in and intended for use in interstate commerce—namely, these products and services are intended to assist Finite State's customers satisfy the EU Cyber Resilience Act, FDA guidance under 21 U.S.C. § 360n-2 (section 524B), ISA/IEC 62443, and related other state, federal and international regulatory regimes.

105. Those trade secrets derive independent economic value from not being generally known or readily ascertainable by proper means, and are the subject of reasonable measures to keep them secret.

106. Linker acquired them lawfully during her employment with Finite State, under a duty to maintain their secrecy and limit their use arising from the Confidentiality Agreement and

the Separation Agreement, and has misappropriated or threatens to misappropriate them by working for ArgusEye as Head of Product.

107. Moreover, Finite State is threatened by further misappropriation by Linker who will inevitably disclose and misuse Finite State's trade secrets because of the close competitive position of ArgusEye.

108. Finite State is entitled to injunctive relief under 18 U.S.C. § 1836(b)(3)(A), and damages under § 1836(b)(3)(B).

## THIRD CLAIM FOR RELIEF

### Misappropriation of Trade Secrets — Ohio Uniform Trade Secrets Act, Ohio Rev. Code § 1333.61 et seq.

109. Finite State repeats and realleges the allegations above as if fully set forth here.

110. The information described above constitutes trade secrets under Ohio Rev. Code § 1333.61(D), and Linker has misappropriated or threatens to misappropriate them within the meaning of § 1333.61(B).

111. Moreover, Finite State is threatened by further misappropriation by Linker who will inevitably disclose and misuse Finite State's trade secrets because of the close competitive position of ArgusEye.

112. Actual or threatened misappropriation may be enjoined under Ohio Rev. Code § 1333.62(A). Finite State is entitled to injunctive relief and damages under § 1333.63.

## FOURTH CLAIM FOR RELIEF

### Recovery of Consideration Under Separation Agreement § 16

113. Finite State repeats and realleges the allegations above as if fully set forth here.

114. Linker's employment with ArgusEye during the restricted period is a material breach of the Separation Agreement. Section 16 entitles Finite State, upon such a breach,

immediately to recover and to cease providing the consideration paid under the Agreement, less One Hundred Dollars ($100.00), and to obtain damages.

115. Finite State is entitled to recover $63,362.00 of the severance payment, plus any COBRA reimbursements paid, and to cease any further payments.

## PRAYER FOR RELIEF

WHEREFORE, Finite State respectfully requests that this Court grant the following relief:

1. A temporary restraining order and preliminary injunction enjoining Linker, through May 22, 2027, from working for or providing services to ArgusEye, Inc. or any other company that directly competes with Finite State in the cybersecurity, IoT security, or device security software and services markets, in accordance with Section 12 of the Separation Agreement;
2. An order extending that period by the number of days between July 31, 2026 and the date of judgment during which Linker worked for ArgusEye in breach of Section 12;
3. In the alternative, an order modifying Section 12(a) to the minimum extent necessary to render it enforceable under Ohio law, and enjoining Linker in accordance with Section 12(a) as so modified;
4. A temporary restraining order and preliminary injunction enjoining Linker from using or disclosing any of Finite State's trade secrets or confidential or proprietary information to any person or entity;
5. A temporary restraining order and preliminary injunction enjoining Linker, through May 22, 2027, from directly or indirectly soliciting, inducing, recruiting, or encouraging any Finite State employee or consultant to end their relationship with Finite State or to become employed or engaged by Linker or any third party;

6. An order requiring Linker to return all Finite State property and information in whatever form and wherever stored, to permit a forensically sound inspection and deletion of any Finite State information on Linker's personal devices, accounts, or cloud storage at Linker's cost, and to preserve all materials relevant to this action;
7. A permanent injunction granting the relief described in paragraphs 1 through 4;
8. Damages to be proven at trial, including recovery of the consideration paid under the Separation Agreement less One Hundred Dollars ($100.00), and exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and Ohio Rev. Code § 1333.63(B);
9. Finite State's attorneys' fees and costs under Section 25 of the Separation Agreement, 18 U.S.C. § 1836(b)(3)(D), and Ohio Rev. Code § 1333.64; and
10. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ John F. Marsh*

John F. Marsh, Trial Attorney (0065345)
Adrian Radilla (0104701)
Bailey Cavalieri LLC
10 West Broad Street, Suite 2100
Columbus, Ohio 43215-3422
Telephone No. (614) 229-3230 Facsimile No. (614) 221-0479
Email: jmarsh@baileycav.com
aradilla@baileycav.com

Russell Beck (*pro hac vice pending*)
Sarah C. C. Tishler (*pro hac vice pending*)
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts 02110 Telephone No. (617) 500-8660
Email: rbeck@beckreed.com
tishler@beckreed.com

**VERIFICATION**

I, Matt Wyckhouse, am the CEO of Finite State, Inc., and am authorized to make this verification on its behalf. I have read the foregoing Verified Complaint and declare under penalty of perjury under the laws of the United States of America that the facts stated in it are true and correct to the best of my knowledge, information, and belief.

Executed on August 24, 2026.

Matt Wyckhouse, CEO
Finite State, Inc.